## SYLVAN R. SHEMITZ DESIGNS, INC. *v.* NEWARK CORPORATION ET AL.
### (SC 17998)

Katz, Palmer, Sullivan, Thompson and Gordon, Js.

Argued January 7, 2008—officially released April 21, 2009

*David R. Schaefer*, with whom was *Sean M. Fisher*, for the appellant (plaintiff).

*Melissa Sullivan*, with whom, on the brief, was *John H. Kane*, for the appellees (defendant General Electric Company et al.).

*Opinion*

PALMER, J. Under General Statutes §§ 52-572m (d)[1] and 52-572n (c)[2] of the Connecticut Product Liability Act (act); see General Statutes § 52-572m et seq.; commercial losses, in contrast to damage to property, are not recoverable in a product liability action as between commercial parties. In this case, Elliptipar, Inc. (Elliptipar), a division of the plaintiff company, Sylvan R.

---

[1] General Statutes § 52-572m provides in relevant part: "As used in this section and sections 52-240a, 52-240b, 52-572n and 52-572q, inclusive, and 52-577a:

\* \* \*

"(d) 'Harm' includes damage to property, including the product itself, and personal injuries including wrongful death. As between commercial parties, 'harm' does not include commercial loss. . . ."

[2] General Statutes § 52-572n provides: "(a) A product liability claim as provided in sections 52-240a, 52-240b, 52-572m to 52-572q, inclusive, and 52-577a may be asserted and shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product.

"(b) A claim may be asserted successfully under said sections notwithstanding the claimant did not buy the product from or enter into any contractual relationship with the product seller.

"(c) As between commercial parties, commercial loss caused by a product is not harm and may not be recovered by a commercial claimant in a product liability claim. An action for commercial loss caused by a product may be brought only under, and shall be governed by, title 42a, the Uniform Commercial Code."

Shemitz Designs, Inc. (plaintiff), sold to its customers a product containing a defective part that had been manufactured by the defendant General Electric Company (General Electric) and the defendant Regal-Beloit Corporation (Regal).[3] Thereafter, the plaintiff incurred costs for replacing the part and otherwise repairing damage to its product that had been caused by the defective part. The issue presented by this appeal is whether, under the act, those costs constitute damage to property and, therefore, are recoverable by the plaintiff against the defendants, or whether the costs represent unrecoverable commercial losses. We conclude, contrary to the determination of the trial court, that the costs constitute damage to property that the plaintiff may recover.

The record reveals the following relevant facts and procedural history. The plaintiff is a manufacturer of commercial and residential lighting fixtures. For many years, one of its divisions, Elliptipar, purchased capacitor boots (boots), an insulation product that is used in lighting fixtures, from Newark Corporation, a distributor of such products. The boots were manufactured by General Electric until 2004, when Regal acquired the manufacturing operation of General Electric. Since that time, Regal has manufactured the boots. Elliptipar used those boots in the manufacture of the lighting fixtures that it sold to its customers.

In approximately July, 2004, Elliptipar began receiving reports from its customers that lighting fixtures containing the boots were failing, often within two weeks of the time that the fixtures had been placed in operation. Elliptipar conducted an investigation and determined that the failure of the lighting fixtures was

---

[3] The plaintiff also named Newark Corporation (Newark) as a defendant. Because Newark is not a party to this appeal, however, we hereinafter refer to General Electric and Regal as the defendants.

caused by a defect in the boots that resulted in arcing and ignition. In response to the problem, Elliptipar repaired and, when necessary, replaced the lighting fixtures that had been damaged by the boots. Elliptipar also replaced the boots in those fixtures that had been sold but not yet damaged. In September, 2005, the plaintiff commenced the present action against the defendants, among others, to recover the costs that it had incurred in repairing and replacing the fixtures that Elliptipar had sold to its customers. The plaintiff alleged strict liability under the act,[4] and a breach of the implied warranty of merchantability under the Uniform Commercial Code (UCC). See General Statutes § 42a-2-314.

The defendants filed a motion to strike the plaintiff's strict liability claim on the ground that the claim sought damages for commercial loss between commercial parties, and that such damages are not recoverable under the act. The defendants also moved to strike the plaintiff's claim of breach of the implied warranty of merchantability, alleging, first, that the plaintiff's claim is barred by the exclusivity provision of the act; see General Statutes § 52-572n (a);[5] and, second, that the claim is legally insufficient under the UCC because it did not allege privity of contract between the parties.

The trial court granted the defendants' motion to strike the plaintiff's strict liability claim. In support of its conclusion, the court explained that, under § 52-572n (a), a product liability claim may be asserted only "for harm caused by a product . . . ." (Internal quota-

---

[4] The product liability claim alleges in relevant part: "As a result of the [c]apacitor [b]oots being defective, Elliptipar has suffered damages in replacing the [c]apacitor [b]oots in the [l]ight [f]ixtures which had been sold to customers, repairing the damage caused by the [c]apacitor [b]oots to the [l]ight [f]ixtures themselves and/or replacing the damaged [l]ight [f]ixtures, and the time of Elliptipar's employees in investigating and rectifying the problems caused by the defective [c]apacitor [b]oots."

[5] See footnote 2 of this opinion.

tion marks omitted.) The court further explained that, under the definitional section of the act; see General Statutes § 52-572m (d);[6] " '[h]arm' includes damage to property, including the product itself, and personal injuries including wrongful death" but "does not include commercial loss." (Internal quotation marks omitted.) The court concluded that, although "the alleged damage to the light fixtures and boots was undoubtedly 'damage to property' with respect to the owners of the property at the time the property damage occurred, [the plaintiff] was not such an owner. [The plaintiff] admits in its complaint that the property in question had been sold to other customers. [The plaintiff's] damages came about because it had to repair [or] replace . . . [the light fixtures containing the defective boots] or otherwise pay for the property damage suffered by its customers. This was monetary damage. The damage to [the plaintiff], unlike the damage to its customers, was thus 'commercial loss.' "

In reaching its determination, the trial court acknowledged that the act does not expressly "address the issue of whether an item of damages may be 'damage to property' as to one downstream purchaser and 'commercial loss' with respect to another." The court reasoned, however, that its conclusion in the present case was consistent with the common-law principle that a claimant " 'may not recover in negligence for economic loss resulting from bodily harm to another or from physical damage to property in which the plaintiff has no proprietary interest.' [4 F. Harper, F. James & O. Gray, Torts (2d Ed. 1986) § 25.18A, p. 619]."

The trial court also granted the defendants' motion to strike the plaintiff's claim of a breach of the implied warranty of merchantability. Specifically, the court agreed with the defendants that the plaintiff could not

---

[6] See footnote 1 of this opinion.

establish privity between the parties, and that the lack of privity was fatal to the plaintiff's claim.

On appeal,[7] the plaintiff contends that the trial court improperly concluded that, because the plaintiff did not own the property that had been damaged, the expenses that it incurred in remedying the damage caused by the defective boots constituted a nonrecoverable commercial loss. Although the plaintiff acknowledges that the act provides the exclusive remedy against a seller of a defective product; see, e.g., *Hurley* v. *Heart Physicians, P.C.*, 278 Conn. 305, 325, 898 A.2d 777 (2006) (act "was intended to serve as the exclusive remedy for a party who seeks recompense for . . . injuries caused by a product defect" [internal quotation marks omitted]); the plaintiff also contends that, if we conclude that the trial court properly determined that the plaintiff does not have a remedy under the act, then we should reverse the trial court with respect to its ruling on the defendants' motion to strike the plaintiff's claim of a breach of the implied warranty of merchantability.[8] For the reasons that follow, we conclude that the trial court improperly granted the defendants' motion to strike the plaintiff's claim of strict liability under the act. In light of that determination, we also conclude that the exclusivity provision of the act bars the plaintiff's claim of a breach of the implied warranty of merchantability under the UCC.[9]

---

[7] The plaintiff appealed to the Appellate Court from the trial court's partial judgment, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[8] In particular, the plaintiff claims that we should recognize an exception to the general rule requiring privity of contract between the parties in an action for breach of warranty under the UCC. As the plaintiff maintains, to conclude otherwise, while also concluding that the plaintiff has no recourse under the act, would leave it without a remedy for the expenses that it incurred as a result of the defective boots.

[9] We conclude, therefore, that the trial court properly granted the defendants' motion to strike the plaintiff's claim of breach of the implied warranty of merchantability, albeit not for the same reason on which we base our conclusion that the motion to strike that claim must be denied, namely, the

Before addressing the merits of the plaintiff's claim, we set forth the applicable standard of review. "A motion to strike challenges the legal sufficiency of a pleading . . . and, consequently, requires no factual findings by the trial court. As a result, our review of the court's ruling is plenary. . . . We take the facts to be those alleged in the complaint that has been stricken and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. . . . [I]f facts provable in the complaint would support a cause of action, the motion to strike must be denied. . . . Thus, we assume the truth of both the specific factual allegations and any facts fairly provable thereunder. In doing so, moreover, we read the allegations broadly . . . rather than narrowly. . . .

"Furthermore . . . the [plaintiff's claim] raises an issue of statutory construction. It is well settled that in construing statutes, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . [W]e seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply.[10] . . . Finally, we review de novo the trial court's construction of the relevant statutory provisions." (Citations omitted; internal quotation marks omitted.) *Greco* v. *United*

exclusivity provision of the act. See General Statutes § 52-572n (a). In view of our determination concerning the applicability of that provision, we need not decide whether the trial court correctly concluded that the plaintiff had failed to state a legally cognizable claim of breach of the implied warranty of merchantability for lack of privity.

[10] Under General Statutes 1-2z, "[t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." Neither the plaintiff nor the defendants, however, have raised a persuasive claim that the term "commercial loss" is plain and unambiguous as applied to the facts of the case.

*Technologies Corp.*, 277 Conn. 337, 347–48, 890 A.2d 1269 (2006).

We also note, preliminarily, that the defendants do not dispute that the damages that the plaintiff seeks to recover in connection with its product liability claim represent the costs that the plaintiff actually incurred in remedying the damage to the lighting fixtures that had been caused by the defective boots. In other words, the defendants do not contend that the damages that the plaintiff seeks are for consequential economic loss such as lost profits, loss of commercial opportunities or damage to business reputation. The defendants' sole contention is that the term "damage to property" in § 52-572m (d) pertains only to property that is owned by the party seeking to recover under the act. Thus, the defendants maintain that the trial court properly concluded that, when a commercial party sells a product containing a defective part to a commercial buyer and then incurs costs to repair or replace that product, those costs are not recoverable against the manufacturer of the defective part because, under § 52-572m (d), the costs constitute a nonrecoverable commercial loss. We disagree with this construction of the act.

Our disagreement with the statutory interpretation urged by the defendants and adopted by the trial court stems from the fact, first, that the language of the act imposes no express requirement that a claimant own the property that has been damaged in order to bring an action seeking compensation for damage to that property. Under General Statutes § 52-572n (a), a product liability action may be brought only for "harm caused by a product." Although "harm" is defined in General Statutes § 52-572m (d) as "damage to property, including the product itself, and personal injuries including wrongful death," as between commercial parties, "harm" does not include "commercial loss" caused by a product. General Statutes § 52-572n (c). The act,

however, contains no definition of the term "commercial loss." Thus, under the construction advocated by the defendants, we would be required to read into the term a prohibition against recovery for economic losses suffered by a claimant resulting from damage to property that the claimant no longer owns. We are reluctant to impose such a limitation on recovery in the absence of any linguistic support in the act for that interpretation.

In fact, other provisions of the act militate against the interpretation urged by the defendants. See, e.g., *In re Valerie D.*, 223 Conn. 492, 524, 613 A.2d 748 (1992) ("[s]tatutes are to be interpreted with regard to other relevant statutes because the legislature is presumed to have created a consistent body of law" [internal quotation marks omitted]); *Powers* v. *Ulichny*, 185 Conn. 145, 149, 440 A.2d 885 (1981) ("[w]e make every effort to construe a statutory scheme as a consistent whole"). For example, under General Statutes § 52-572m (c), "claimant" is defined broadly as "a person asserting a product liability claim for damages incurred by the claimant . . . ." Under General Statutes § 52-572m (b), a "product liability claim" is defined as a claim or action "brought for personal injury, death or property damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing . . . or labeling of any product." The plaintiff in the present case clearly satisfies these definitional prerequisites because it seeks to recover only losses directly related to property damage caused by a product, namely, the defective boots.

In addition, as the plaintiff notes, the act expressly contemplates and provides for the allocation of liability along a product's chain of distribution. For example, under General Statutes § 52-577a (b), the defendant in a product liability action "may implead any third party who is or may be liable for all or part of the claimant's

claim, if such third party defendant is served with the third party complaint within one year from the date the cause of action brought [by the claimant] . . . is returned to court." That same defendant also may bring an action for contribution[11] under General Statutes § 52-572o (e) "within one year after the judgment becomes final. If no judgment has been rendered, the person bringing the action for contribution either must have (1) discharged by payment the common liability within the period of the statute of limitations applicable to the right of action of the claimant against him and commenced the action for contribution within one year after payment, or (2) agreed while action was pending to discharge the common liability and, within one year after the agreement, have paid the liability and brought an action for contribution." This court has stated that §§ 52-577a (b) and 52-572o (e) "implicitly authorize the initiation of contribution actions by defendants in product liability cases . . . ." *Malerba* v. *Cessna Aircraft Co.*, 210 Conn. 189, 195–96, 554 A.2d 287 (1989).

We agree with the plaintiff that the interpretation of the term "commercial loss" advocated by the defendants effectively nullifies the impleader and contribution provisions of the act because the parties that avail themselves of those provisions invariably are commercial parties[12] seeking to recover from *other commercial*

---

[11] "Contribution is a payment made by each, or by any, of several having a common interest or liability of his share in the loss suffered, or in the money necessarily paid by one of the parties in behalf of the others. . . . The right of action for contribution, which is equitable in origin, arises when, as between multiple parties jointly bound to pay a sum of money, one party is compelled to pay the entire sum. That party may then assert a right of contribution against the others for their proportionate share of the common obligation." (Citations omitted; internal quotation marks omitted.) *Crotta* v. *Home Depot, Inc.*, 249 Conn. 634, 639–40, 732 A.2d 767 (1999).

[12] Indeed, defendants in product liability actions are by definition commercial parties. See General Statutes § 52-572n (a) ("[a] product liability claim as provided in [§] . . . 52-572m . . . may be asserted and shall be in lieu of all other claims against *product sellers*" [emphasis added]); see also General Statutes § 52-572m (a) (" 'Product seller' means any person or entity,

*parties* expenses incurred in remedying property damage caused by a defective product that neither of the commercial parties actually owned when the damage occurred. Under the defendants' reasoning, however, every action brought for reimbursement of a product liability judgment or settlement under § 52-572o (e), or for indemnification under § 52-577a (b), would be an action to recover commercial loss and, therefore, barred under the act. It is a basic tenet of statutory construction, however, that "the legislature [does] not intend to enact meaningless provisions." (Internal quotation marks omitted.) *Semerzakis* v. *Commissioner of Social Services,* 274 Conn. 1, 18, 873 A.2d 911 (2005). Rather, "the legislature is always presumed to have created a harmonious and consistent body of law . . . . [T]his tenet of statutory construction . . . requires [this court] to read statutes together when they relate to the same subject matter . . . . Accordingly, [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction. . . . [T]he General Assembly is always presumed to know all the existing statutes and the effect that its action or non-action will have [on] any one of them." (Citations omitted; internal quotation marks omitted.) *Hatt* v. *Burlington Coat Factory,* 263 Conn. 279, 310, 819 A.2d 260 (2003). We doubt that the legislature intended for the term "commercial loss" in § 52-572m (d) to encompass costs incurred by a commercial party in remedying property damage caused by a defective product because such an interpretation of the act contravenes these fundamental precepts of statutory construction.

---

including a manufacturer, wholesaler, distributor or retailer *who is engaged in the business of selling such products* whether the sale is for resale or for use or consumption. The term 'product seller' also includes lessors or bailors of products *who are engaged in the business of leasing or bailment of products.*" [Emphasis added.]).

We recognize that there is a split of authority in the Superior Court as to whether the act permits claims for contribution and indemnification as between commercial parties for costs incurred in repairing damage to property otherwise covered by the act. The defendants, of course, urge us to adopt the view of those courts that have concluded that such claims are not permitted because they seek the recovery of commercial loss.[13] We decline to do so. As one Superior Court judge observed in declining to follow that line of cases, "[t]he view espoused in [those cases] is attractive for its simplicity: commercial loss encompasses economic loss and payment of a product liability judgment constitutes economic loss; ergo, contribution and indemnity claims seeking reimbursement for such payments are claims for commercial loss outside the parameters of a product liability action. The fundamental flaw with this analysis [however] is that it sweeps too broadly and whisks away contribution and indemnity claims that are clearly authorized by the provisions of the [product] liability statute. Section 52-572o (e) expressly authorizes an independent action for contribution and § 52-577a (b) has been interpreted to allow third-party contribution and indemnification claims . . . ." (Citation omitted.) *Silent Stalker, Inc.* v. *Vickers Engineering*, Superior Court, judicial district of Ansonia-Milford, Docket No. CV02-0078923S (July 25, 2003) (35 Conn. L. Rptr. 286, 288) (*Alander, J.*); see also, e.g.,

---

[13] *Producto Machine Co.* v. *Ajax Magnethermic Corp.*, Superior Court, judicial district of Fairfield, Docket No. 236005 (November 10, 1987) (*Burns, J.*) (equating commercial loss with "economic injury, whether direct, incidental, or consequential, including property damage and damage to the product itself" [internal quotation marks omitted]); accord *Kokoff Feed, Inc.* v. *Agway, Inc.*, Superior Court, judicial district of New London, Docket No. 522748 (January 6, 1995) (*Austin, J.*); see also *Smith* v. *Yankee Motor Inn, Inc.*, Superior Court, judicial district of New London, Docket No. 523560 (July 22, 1994) (*Leuba, J.*); *BRT Corp.* v. *New England Masonry Co.*, Superior Court, judicial district of Litchfield, Docket No. 0048920 (October 25, 1991) (*Pickett, J.*).

*Cartelli* v. *Laurick Enterprises, LLC,* Superior Court, judicial district of Middlesex, Docket No. CV03-0101983 (December 15, 2004) (*Silbert, J.*) ("[T]he more persuasive interpretation [of the act] distinguishes between damages suffered from true commercial loss . . . a loss related to commerce . . . and those arising from economic loss as a result of property damage . . . . Under the broader 'commercial loss' approach, indemnification actions could never be brought by a party who paid damages to satisfy a prior product liability judgment in which another product seller was involved in the design, assembly or manufacture of the defective product."); *Johnson* v. *Chalmers,* Superior Court, judicial district of Tolland, Docket No. X07 CV99-0074165S (November 30, 2000) (29 Conn. L. Rptr. 43, 44–45) (*Bishop, J.*) ("[I]t is [a mistake] to equate 'commercial loss' with economic loss. Such a broad construction of the term 'commercial loss' could defeat the purposes of the [act] by insulating manufacturers from the full consequences of damages caused by defective products and could make meaningless the impleader section of the statute. The evident intent of this statute is to permit a product seller against whom a product liability action has been brought to implead the product distributor or manufacturer so as to be economically insulated from the consequences of an adverse judgment. If the term 'commercial loss' is accorded [a] broad definition . . . the right to implead a product seller would be illusory."); *American Manufacturers Mutual Ins. Co.* v. *Harrington Hoists, Inc.,* Superior Court, judicial district of New Haven, Docket No. 262369 (June 13, 1989) (*Berdon, J.*) (" 'commercial loss' . . . as used in the [act], merely has reference to consequential economic losses, and it does not include property damage or personal injury as between the commercial parties"). Thus, we find persuasive and adopt the view of the trial court cases that have determined that the term "commercial

loss" does not encompass costs incurred by a commercial party in repairing or replacing a defective product, or in repairing property damage caused by a defective product.

Furthermore, although there is little legislative history surrounding the 1984 amendment to the act that added the language prohibiting the recovery of commercial loss; see Public Acts 1984, No. 84-509, § 1 (P.A. 84-509); what little there is strongly suggests that the term "commercial loss" does not encompass the type of damages that the plaintiff seeks in the present case. In *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 582–83, 657 A.2d 212 (1995), we noted that the 1984 amendment was enacted in response to our decision in *Verdon* v. *Transamerica Ins. Co.*, 187 Conn. 363, 372–73, 446 A.2d 3 (1982), in which we adopted a very expansive interpretation of the term "damage to property" in General Statutes (Rev. to 1981) § 52-572m,[14] concluding that it referred not only to the property damage itself, but to any and all consequential economic losses flowing from the property damage.[15] "Subsequent to our decision in *Verdon*, however, the legislature amended § 52-572m (d) in 1984, specifically to exclude purely commercial loss from the definition of 'harm.' [P.A.] 84-509, § 1." *Williams Ford, Inc.* v. *Hartford Courant Co.*, supra, 583.

---

[14] "At the time of our decision in *Verdon* v. *Transamerica Ins. Co.*, supra, 187 Conn. 363, General Statutes (Rev. to 1981) § 52-572m (d) provided that the harm for which relief was afforded was defined to include 'damage to property, including the product itself and personal injuries including wrongful death.'" *Williams Ford, Inc.* v. *Hartford Courant Co.*, supra, 232 Conn. 583 n.19.

[15] In *Verdon*, we were required to interpret the phrase "damage to the property of any person" in an insurance statute, namely, General Statutes (Rev. to 1981) § 38-175, and relied on "the gloss imparted by the legislative history [on] the similar term 'damage to property' in [General Statutes (Rev. to 1981)] § 52-572m (d) . . . ." *Verdon* v. *Transamerica Ins. Co.*, supra, 187 Conn. 373.

Although we did not explain in *Williams Ford, Inc.*, exactly what we meant by the phrase "purely commercial loss," the only witness to testify before the judiciary committee in support of the 1984 amendment, Gregory Sweeney,[16] expressly addressed the purpose of the amendment. He stated: "The [b]ill under consideration is designed to clarify the application of the [act] to commercial entities in their dealings with one another.

"The [b]ill has two objectives. First, recovery of damages for commercial loss caused by a product is appropriately identified as a matter governed by commercial law and thus, outside of the scope of the [act]. . . .

"With respect to the first portion of the [b]ill, that dealing with commercial loss, as modified . . . the [act] would permit commercial entities to bring product liability claims for property damage and personal injury damage caused by a product. However, commercial loss such as alleged lost profit, loss of commercial opportunities, loss of goodwill and the like, would not be sought under a product liability claim.

"Rather, actions for such commercial loss would be brought under the . . . provisions of the [UCC]. In making this modification to the [act], Connecticut would be falling in line with the states of Washington and Kansas [which] have similarly structured product liability statutes and have made similar modifications to the definition of harm . . . for which [an] action can be brought under the [act]." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 3, 1984 Sess., pp. 747–48. Sweeney concluded: "In summary, we view the [b]ill under consideration as primarily a clarification of the interests that the [act] is designed to protect, rather than a substantive change in product liability law." Id., p. 749.

---

[16] At the time of his testimony, Sweeney was the senior assistant division counsel of Sikorsky Aircraft Division of United Technologies Corporation.

"It is now well settled that testimony before legislative committees may be considered in determining the particular problem or issue that the legislature sought to address by the legislation. . . . This is because legislation is a purposive act . . . and, therefore, identifying the particular problem that the legislature sought to resolve helps to identify the purpose or purposes for which the legislature used the language in question." (Internal quotation marks omitted.) *Matey* v. *Estate of Dember*, 256 Conn. 456, 484–85, 774 A.2d 113 (2001). Sweeney's testimony indicates that the purpose of the 1984 amendment was to clarify, in light of our then recent decision in *Verdon*, that, although a commercial claimant may recover from another commercial party costs incurred in remedying damage to property caused by a defective product, consequential economic loss flowing from the property damage is not recoverable under the act.

Finally, our construction of the term "commercial loss" "is consistent with the public policy rationales supporting the imposition of strict products liability"; *Potter* v. *Chicago Pneumatic Tool Co.*, 241 Conn. 199, 234, 694 A.2d 1319 (1997); which include, among others, "that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it . . . [and] that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely [on] the seller, that reputable sellers will stand behind their goods . . . ." Id., 234–35. Consistent with these policies, the plaintiff in the present case stood behind the light fixtures that it sold to its customers and voluntarily repaired or replaced the fixtures that had been damaged by the boots, thus relieving the customers of the trouble and expense of commencing and prosecuting an action to recover damages. We agree

with the plaintiff that the trial court's determination that the damages in the present case represent a nonrecoverable commercial loss contravenes not only the express provisions of the act that permit and promote the allocation of liability along a product's chain of distribution to the ultimate responsible party but, also, the act's purpose of engendering responsible business practices.[17]

---

[17] We note that the trial court, in reaching its conclusion that the damages that the plaintiff seeks are nonrecoverable commercial losses, relied on *Connecticut Mutual Life Ins. Co.* v. *New York & N.H. Railroad Co.*, 25 Conn. 265 (1856), in which this court determined that an insurance company could not recover from a railroad company the life insurance proceeds that it had paid to the estate of a man who was killed by one of the railroad company's trains because the injury was derivative of the decedent's injury. We stated in that case: "To open the door of legal redress to wrongs received through the mere voluntary and factitious relation of a contractor with the immediate subject of the injury, would be to encourage collusion and extravagant [contracts] between men, by which the death of either through the involuntary default of others, might be made a source of splendid profits to the other, and would also invite a system of litigation more portentious than our jurisprudence has yet known. So self-evident is the principle that an injury thus suffered is indirectly brought home to the party seeking compensation for it, that courts have rarely been called [on] to promulgate such a doctrine." Id., 274–75. The trial court also relied on *Ganim* v. *Smith & Wesson Corp.*, 258 Conn. 313, 780 A.2d 98 (2001), in which we held that the city of Bridgeport lacked standing to bring product liability claims against the manufacturers of handguns because the injuries that the city allegedly suffered—increased costs to municipal agencies that provide services to gunshot victims—were "remote, derivative and indirect . . . ." Id., 351. In rejecting the city's claim, we observed that "there [were] numerous steps between the conduct of the various defendants and the harms suffered by the [city]"; id., 355; and that "factors other than the . . . manufacture, advertisement, distribution and retail sales of guns contribute[d] in significant measure to the various harms claimed by the [city]." Id., 356. The trial court in the present case concluded that *Connecticut Mutual Life Ins. Co.* "makes it clear that 'damage to property' in the hands of one person may be 'commercial loss' in the hands of another . . . [and] *Ganim* makes it clear that these considerations apply to the product liability statutes."

We agree with the plaintiff that the trial court's reliance on *Connecticut Mutual Life Ins. Co.* and *Ganim* was misplaced because those cases merely stand for the well established proposition, as stated in *Ganim*, that "[e]very injury has ramifying consequences, like the ripplings of the waters, without end. The problem for the law is to limit the legal consequences of wrongs to a controllable degree." (Internal quotation marks omitted.) *Ganim* v. *Smith & Wesson Corp.*, supra, 258 Conn. 349. In the present case, however,

The judgment is reversed in part and the case is remanded with direction to deny the defendants' motion to strike the plaintiff's product liability claim and for further proceedings according to law.

In this opinion the other justices concurred.

we are not called on to decide where to draw the line with respect to the imposition of liability for the defective boots. By expressly authorizing the defendant in a product liability action to implead any product seller that the defendant believes may be liable for the plaintiff's damages, and by authorizing contribution actions as between commercial parties to recover payments made pursuant to the act, the legislature itself has drawn the line to include any seller along a product's chain of distribution whose actions may have caused the damages recoverable under the act.