******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

R.I. POOLS, INC. *v.* PARAMOUNT
CONCRETE, INC.
(AC 34363)

Lavine, Sheldon and Keller, Js.

*Argued October 24, 2013—officially released May 6, 2014*

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, Complex Litigation Docket,
Blawie, J.)

*Michael S. Taylor*, for the appellant (defendant).

*Raymond J. Plouffe, Jr.*, for the appellee (plaintiff).

*Opinion*

KELLER, J. The plaintiff, R.I. Pools, Inc., brought this action under the Connecticut Product Liability Act (act), General Statutes § 52-572m et seq., seeking damages against the defendant, Paramount Concrete, Inc., for having sold it an allegedly defective product that it used in its construction of several luxury swimming pools for homeowners in Fairfield County.[1] The defendant appeals from the judgment of the trial court, rendered following a jury trial, in favor of the plaintiff. The defendant claims that the court improperly (1) denied its motion to set aside the verdict, and (2) awarded the plaintiff punitive damages. We agree with the defendant that the jury's award of compensatory damages and the court's award of punitive damages must be reversed. Accordingly, we remand the matter to the trial court for a hearing in damages on the plaintiff's claim for compensatory damages, and a separate hearing to determine the plaintiff's award of punitive damages.[2]

By means of its amended complaint dated February 14, 2011, the plaintiff alleged that it purchased a concrete product, Shotcrete, from the defendant. The plaintiff installed the Shotcrete in several pools and spas that it built for homeowners in the course of its pool and spa construction business. The plaintiff alleged that the Shotcrete "has thus far cracked in at least seventeen pools," causing property damage. The plaintiff, expressly invoking the act, alleged that the defendant was liable for all damages and losses it had sustained as a result of the defective Shotcrete, in that (1) "the Shotcrete should have been made with concrete sand only, not masonry sand or a combination of masonry sand and concrete sand"; (2) "the Shotcrete was improperly mixed"; (3) "the Shotcrete was made, distributed and/or delivered by machines and equipment that were not properly maintained, repaired and/or equipped"; (4) "improper amounts and/or grade of ingredients were utilized"; and (5) "[the defendant] failed to warn or advise [the plaintiff] of the foregoing and of the potential for danger and damage it posed to the pools and spas being constructed by [the plaintiff], as well as the potential for damages and losses to the surrounding real and personal property in the vicinity of these pools."

The plaintiff alleged that, "even though [the defendant] knew or should have known that the Shotcrete it was selling was not in compliance with industry standards and deviated from product design requirements and recommendations, [the defendant] made representations to the contrary, thereby purposefully misleading its customers, including [the plaintiff], despite knowing that such customers were relying upon their representations and the purported quality and fitness of their product in building substantial construction projects, including pools, spas and other structures . . . ." Fur-

thermore, the plaintiff alleged that "[the defendant] operated a concrete/Shotcrete plant without personnel that had sufficient expertise and/or training in the proper mixture and/or amounts and/or grade of ingredients for Shotcrete, and/or proper delivery for Shotcrete when it knew or should have known that the operation of a concrete/Shotcrete plant without such sufficient expertise created a high probability of causing substantial injury to product users, and consumers, including the plaintiff, and their respective property." On the basis of these allegations, as well as the allegations previously set forth, the plaintiff claimed that the defendant's course of conduct "was in reckless disregard for the safety of product users, consumers and the plaintiff and their respective property which were injured by the product . . . ."

The plaintiff alleged that, as a result of the defendant's defective product as well as its "egregious conduct," it had sustained substantial financial losses and damages, "including the costs of repair and/or replacement of seventeen pools, spas, landscaping, and hardscaping, and the potential for additional losses and damages if cracking and other related failures occur in some or all of the other pools and spas it built with Shotcrete supplied by the defendant." The defendant denied having sold the plaintiff a defective product and, by means of special defense, alleged that any losses sustained by the plaintiff had resulted from "its misuse, alteration and/or modification of the product at issue . . . ."[3]

At trial, the plaintiff presented evidence of varying degrees of crack damage in nineteen completed swimming pools it had built using Shotcrete manufactured by and purchased from its subcontractor, the defendant.[4] The plaintiff presented evidence that the cracks found in all of the pools at issue had been caused by Shotcrete that had not been mixed to a proper consistency, which, in turn, had led to excessive shrinking in completed pools. The defendant, denying that it had sold defective Shotcrete, attempted to prove that the cracking at issue had resulted from the defective construction practices of the plaintiff.

During closing argument, the plaintiff's attorney stated that the plaintiff wanted to "repair" and "rebuild" the pools at issue. During argument, he referred to a chart that was displayed as a visual aid that, among other things, described the location of each of the nineteen pools at issue as well as the amount of damages, whether past, present or both, that had been incurred or would be incurred by the plaintiff with regard to each pool. Referring to damage amounts specified for each of the nineteen pools at issue, the plaintiff's attorney referred to the evidence and explained the method by which his client had calculated its damages, and argued that the total amount of past and future damages supported by the evidence was $2,760,208.[5] This

amount, which included lost profits to the plaintiff as well as miscellaneous damages listed in the amount of $7680.64, was labeled as the "total" on the chart.

The plaintiff's attorney, however, cautioned that because the plaintiff was not seeking lost profits in its complaint, this "total" amount should be adjusted appropriately. Thus, the plaintiff's attorney argued that the amount of damages proven and sought by the plaintiff, minus lost profits, was $2,365,562. One of the issues submitted to the jury was whether the plaintiff was entitled to an award of punitive damages pursuant to the act and, during argument, the plaintiff's attorney argued in support of such an award.

During its charge, the court stated, in relevant part, that the jury was to consider evidence concerning the nineteen pools about which it had heard evidence and to complete the jury verdict forms, including interrogatories, provided to it. The court stated that part of the jury's obligation would be to provide a "breakdown of [damages related to] each of the nineteen pools about which [it] heard evidence." The court instructed the jury that, in the event that it awarded the plaintiff damages, the amount of damages reflected in its completed interrogatories should be the same figure reflected on the plaintiff's verdict form. Following deliberations, the jury returned a verdict in favor of the plaintiff in the amount of $2,760,207.90, and found that the plaintiff was entitled to punitive damages.

By means of jury interrogatories, the jury, in the context of awarding a plaintiff's verdict, was asked to specify both the "total damages" and the defendant's percentage of fault for each of the nineteen pools for which damages were sought by the plaintiff. The completed interrogatories reflect that, *with respect to each of the nineteen pools at issue*, the jury found that the defendant was 100 percent at fault and the plaintiff was entitled to recover damages in the identical amount of $145,274.10. The completed interrogatory forms reflect that the jury did not award any "miscellaneous damages," as had been requested by the plaintiff. The total damages were specified both in the interrogatories and on the plaintiff's verdict form as $2,760,207.90. After the verdict was announced, the jury was polled and each juror expressed his or her agreement with the verdict. The court did not conduct any further inquiry of the jury concerning its verdict.

Subsequently, the defendant filed a motion to set aside the verdict. Following a hearing, the court denied the motion. Later, the court awarded punitive damages in the amount of attorney's fees incurred by the plaintiff, less costs.[6] The court denied the defendant's motion to reargue this decision. This appeal followed. Additional facts will be set forth as necessary.

I

First, on a variety of grounds, the defendant challenges the court's denial of its motion to set aside the verdict. Before addressing the defendant's arguments, we set forth our standard of review. "The standard of review governing our review of a trial court's denial of a motion to set aside the verdict is well settled. The trial court possesses inherent power to set aside a jury verdict [that], in the court's opinion, is against the law or the evidence. . . . [The trial court] should not set aside a verdict [when] it is apparent that there was some evidence [on] which the jury might reasonably reach [its] conclusion, and should not refuse to set it aside [when] the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles. . . . Ultimately, [t]he decision to set aside a verdict entails the exercise of a broad legal discretion . . . that, in the absence of clear abuse, we shall not disturb." (Internal quotation marks omitted.) *Weyant* v. *Kristy*, 126 Conn. App. 180, 183, 10 A.3d 119 (2011).

## A

The first part of the defendant's claim relates to the jury's finding as to liability. The defendant argues, as it did before the trial court in the context of its motion to set aside the verdict, that the award cannot stand because the plaintiff failed to present evidence that it proximately caused damage to four of the nineteen pools at issue.[7] The gist of the argument is that the testimony of the plaintiff's expert witness with regard to causation, licensed structural engineer Gerard Feldman, reflects that, in connection with four of the pools at issue, he did not conduct any firsthand evaluation of their condition and, in rendering his expert opinion, did not rely on evidence of a type reasonably relied on by experts in his field. Thus, the defendant argues, Feldman's opinion that defective Shotcrete caused the cracking in these pools cannot support the verdict with regard to these four pools.

"[I]n order to recover under the doctrine of strict liability in tort the plaintiff must prove that: (1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition." (Internal quotation marks omitted.) *Potter* v. *Chicago Pneumatic Tool Co.*, 241 Conn. 199, 214, 694 A.2d 1319 (1997). It is not in dispute that the plaintiff was bound to present expert opinion evidence in the present case with regard to causation.

"The mere fact that a witness has been qualified as an expert in a particular field does not itself give the

expert information needed to state an opinion relevant to the case. There remain two additional elements before that opinion may be rendered . . . [a] knowledge of the facts of the case, to which the expert's training and experience may then be applied [and] . . . [t]he perceived reliability or trustworthiness of the principles and theories from the field of expertise which the expert employs to render the opinion . . . .

"The opinions of experts must be based upon facts which have been proved, assumed, or observed, and which are sufficient to form a basis for an intelligent opinion. . . . Opinion evidence should be accompanied by a statement of the facts on which it is based, and as a general rule, an expert must state facts from which the jury may draw [its] conclusions. Conversely, a witness qualified as an expert may not only testify as to the conclusions based upon his skill and knowledge, but also as to the facts from which such conclusions are drawn. . . . [W]here the factual foundation for an expert opinion is not fully disclosed, it cannot be assailed upon appeal if accepted by the jury as sufficient in weight and credibility to support the verdict. . . .

"The fact that an expert opinion is drawn from sources not in themselves admissible does not render the opinion inadmissible, provided the sources are fairly reliable and the witness has sufficient experience to evaluate the information. . . . An expert may base his or her opinion on facts or data not in evidence, provided they are of a type reasonably relied on by experts in the particular field. . . . This is so because of the sanction given by the witness's experience and expertise. . . . An expert may give an opinion based on sources not in themselves admissible in evidence, provided (1) the facts or data not in evidence are of a type reasonably relied on by experts in the particular field, and (2) the expert is available for cross-examination concerning his or her opinion." (Citations omitted; internal quotation marks omitted.) *National Publishing Co.* v. *Hartford Fire Ins. Co.*, 94 Conn. App. 234, 251–53, 892 A.2d 261 (2006), rev'd on other grounds, 287 Conn. 664, 949 A.2d 1203 (2008); see also Conn. Code Evid. § 7-4.

Feldman testified about the types of information on which he relied in forming his opinion that defective Shotcrete caused the cracking at issue in all of the pools. With regard to some of the pools, he testified that the information on which he relied included his firsthand observations of damage and the results of various scientific testing of concrete. With regard to other pools, he testified that the information on which he relied included facts about the condition of the pools that he learned from others. The evidence does not reflect that Feldman personally observed, performed any testing, or in any other manner studied the four pools at issue in this claim. Feldman testified, however, that he heard the trial testimony of John Kavanaugh,

who, during the time at which the pools at issue were constructed, worked at the defendant's concrete plant. Kavanaugh testified with regard to the deficient manner in which the defendant customarily manufactured and transported Shotcrete to job sites, including the location of the four pools at issue in this claim.

The plaintiff's attorney asked Feldman: "To a reasonable degree of structural engineering probability, based upon what you observed at the pools, the nature of the cracks, the size of the cracks, the pattern of the cracks, the shoot date of the pools, the core testing performed, and the commonality of the use of Paramount Shotcrete, did the subject pools [sustain] excessive shrinkage cracks due to nonuniform and different Shotcrete mixes used in the same pool structures?" Feldman replied, "Yes."

During cross-examination, the defendant's attorney asked Feldman about the four pools at issue in this claim, specifically, whether he had ever visited and inspected the four pools personally. Feldman testified that he had not, but that someone had told him that these pools exhibited the same types of cracks as the other pools made with the defendant's Shotcrete that he personally had studied. In response to questions concerning Feldman's ability to render an opinion about pools that he had not examined personally, Feldman stood by his earlier opinion that defective Shotcrete had caused the cracking in all of the pools. During redirect examination, the plaintiff's attorney asked Feldman to render an expert opinion on the basis of hypothetical facts that were supported by the evidence presented at trial. The plaintiff's attorney asked Feldman: "To a reasonable degree of engineering probability, if you take everything that you learned from your studies, regarding these pools, *even if you didn't go to a particular pool such as the pool that we just discussed* where there were repairs and photographs of repairs, if you combined your knowledge of the general timing of the shoot, engineer designs involved, the materials coming from the same concrete plant, similar cracks and crack patterns being reported and/or actually being observed by you, can you say to a reasonable degree of engineering probability that the cause of the excessive cracking in this case was the bad and inconsistent Shotcrete material coming out of [the defendant's] plant at that general time period?" (Emphasis added.) Feldman replied, "Yes."

Feldman identified the factual basis for his opinion, revealing that he relied on many types of information about the pools in question, including, but not limited to, certain trial testimony concerning the Shotcrete manufactured by the defendant that was common to all of the pools at issue in this case. He had studied some of the pools personally, but testified that he relied on statements from a third party in assessing the defec-

tive condition of some of the pools at issue. The defendant has not demonstrated that, as a matter of law, Feldman's testimony was not supported by a sufficient factual basis because it was based on facts perceived or made known to him by others. At length, the defendant cross-examined Feldman concerning the facts on which he had relied. Any weaknesses that such questions may have exposed in Feldman's testimony were fodder for the jury's consideration in evaluating his testimony.

The defendant appears to suggest that Feldman's opinion was legally insufficient because, with regard to the four pools at issue, he neither observed the pools personally nor conducted any testing with regard to them. This requirement, however, does not find support in our law. As previously discussed, an expert witness need not personally study or observe conditions, but may apply his or her specialized knowledge to facts perceived or made known to him at or before the proceeding. Conn. Code Evid. § 7-4 (b). With regard to the pools he did not study personally, the evidence reflects that Feldman did not base his opinion on the *expert opinion* of others, but on *material information* that he learned from others concerning both the physical condition of the pools and the nature of the concrete used in their construction. The expert's reliance on information of such character does not necessarily undermine the reliability of the expert opinion. See, e.g., *Milliun* v. *New Milford Hospital*, 310 Conn. 711, 729–30, 80 A.3d 887 (2013) (reliable medical opinion may be based on inadmissible hearsay).

Moreover, we reiterate that an expert witness may render an opinion on the basis of hypothetical facts that fairly are supported by the evidence. Absent objection, Feldman provided an expert opinion that was based on hypothetical questions, as previously set forth. The defendant has not demonstrated that these questions were not fairly based on facts in evidence. See Conn. Code Evid. § 7-4 (c) (expert witness may give opinion in response to hypothetical questions). On the basis of the foregoing analysis, we conclude that the jury fairly could have reached the liability determination that it did.

B

The second part of the defendant's claim relates to the jury's assessment of compensatory damages. Relying on the arguments it advanced before the trial court, the defendant claims that, in several respects, the evidence was insufficient to support the jury's award of damages. The defendant argues that the court improperly upheld the jury's verdict because (1) with regard to four pools,[8] the jury awarded the plaintiff damages absent any evidence that the plaintiff had performed any repair work or, thus, sustained any damages; (2) with regard to four pools[9] for which respective homeowners had reached settlements with the parties by the time of trial and

thereby established the only possible and proper measure of the plaintiff's damages, the jury awarded damages that exceeded the amounts to which the plaintiff was entitled; (3) the verdict reflects that the jury awarded full replacement costs for all nineteen pools, yet the evidence demonstrated that only six pools arguably needed to be replaced; and (4) the jury's verdict, which was ten cents less than the gross damages figure on which the plaintiff relied in argument, reflects that the jury improperly included an award for lost profits in its calculation of damages in contravention of the court's instructions. We agree with the defendant that the verdict reflects error on the part of the jury and that the jury's award of damages must be overturned.

Previously in this opinion, we set forth the details related to the jury's verdict. Plainly, the amount of damages awarded by the jury exceeded the damages suggested during closing argument by the plaintiff's attorney. Further, the completed interrogatories reflect that, for purposes of awarding damages, the jury treated each of the nineteen pools identically.

Essentially, the plaintiff urges us to view the defendant's claim as being premised on a flawed interpretation of the verdict. The plaintiff argues that, at trial, it suggested a gross award of damages that was based on the evidence and totaled $2,760,208. As discussed previously in this opinion, this amount was set forth during the plaintiff's closing argument and was reflected on the chart used as a visual aid during closing argument. The plaintiff argues that the jury's overall award of $2,760,207.90, just ten cents less than this gross award that its counsel suggested in argument, demonstrates that the jury agreed with the plaintiff's overall interpretation of the evidence and its evaluation of reasonable damages.

The plaintiff acknowledges, however, that "the jury may have taken a mathematical 'shortcut' by dividing an overall fair verdict, which was supported by the evidence [and suggested by the plaintiff's attorney], by the total number of pools to respond to the interrogatories, which resulted in a net award [for damage] to each pool of $145,274.10." The plaintiff, in essence, urges us to reject the defendant's claim because "the jury's intent was clear and manifested in its verdict. The jury determined that the defendant was 100 percent liable for the damages caused to each of the nineteen pools. The gross award of damages matched almost identically the gross amount of documented past repair costs, the 2005/2006 prices of the thirteen pools for which replacements were sought, and the supplemental demolition and landscape restoration costs. The jury's mathematical shortcut in allocating the gross fair award is at best a defect in 'form' and the verdict must be deemed intelligible based on the evidence, arguments, and totality of this case." The plaintiff also suggests that we should look

with disfavor on the present claim because the defendant did not object to the form in which the jury returned its verdict at the time it was returned, and did not seek a remittitur.

As a starting point of our analysis, it does not appear to this court that the jury's verdict was defective as a matter of form. "We note that if a verdict is defective in form alone, rather than as a matter of law, the parties should have objected at a time when the mistake could have been corrected." *Tisdale* v. *Riverside Cemetery Assn.*, 78 Conn. App. 250, 257–58, 826 A.2d 232, cert. denied, 266 Conn. 909, 832 A.2d 74 (2003). "A verdict is not defective as a matter of law as long as it contains an intelligible finding so that its meaning is clear. . . . A verdict will be deemed intelligible if it clearly manifests the intent of the jury." (Citation omitted; internal quotation marks omitted.) Id., 257.

There is no claim regarding the propriety of the interrogatories or the verdict forms provided to the jury. In accordance with the court's instructions, the jury fully completed the interrogatories and verdict forms with which it was provided. Nothing on the face of the completed interrogatories or verdict forms suggests that the jury did not perform its role, insofar as it related to *reporting* its verdict, properly. Consistent with its completed interrogatories, the jury completed the plaintiff's verdict form, awarding $2,760,207.90 in damages. Thus, the verdict forms returned by the jury were complete, consistent, and intelligible. The verdict appeared to manifest the will of the jury.[10]

In several respects, however, the defendant's claim exposes questions related to the propriety of the jury's damage award. The court properly instructed the jury that "[i]njuries and losses for which the plaintiff should be compensated include those it has suffered up to and including the present time, and those it is reasonably likely to suffer in the future as a proximate result of the defective product." In this product liability action, the plaintiff reduced to exact figures the damages it sought. Thus, the plaintiff presented detailed evidence of the cost of repairs it had undertaken with regard to pools for which it sought the recovery of such costs. Likewise, the plaintiff presented evidence of what it would cost, at the time of trial, to replace the pools for which it sought replacement costs. Additionally, the plaintiff presented evidence of what it deemed miscellaneous costs related to the litigation. In argument, the plaintiff presented these figures to the jury as the extent of its damages that were proven by the evidence. This was not a case in which the jury was asked to consider a type of injury for which neither the parties nor the court could readily suggest either an award of damages or a method by which to calculate such damages.

The plaintiff asserts that the overall award of damages is proper because it nearly mirrored the gross

amount of damages that were permitted by the evidence and sought by the plaintiff. The plaintiff does not appear to suggest that the jury's finding of damages for each pool is supported by the evidence. Instead, the plaintiff appears to invite us to disregard the finding of damages for each pool, as set forth in the completed interrogatories, and asks that we evaluate the verdict by looking to the overall award of damages. As stated previously in our discussion, the plaintiff posits that the completed interrogatories should be viewed as a harmless "mathematical shortcut" by which the jury apportioned its award of damages among the nineteen pools at issue.

Contrary to the plaintiff's arguments, there is no authority for the proposition that we should not interpret the jury's interrogatories literally, that is, as an accurate reflection that the jury determined there to be and awarded the plaintiff $145,274.10 in damages for each pool. There is no basis in law for this court to disregard the jury's findings therein as we undertake judicial review of the jury's verdict. "[T]he purpose of interrogatories [is] to elicit a determination of material facts, [and] to furnish the means of testing the correctness of the verdict rendered, and of ascertaining its extent." (Internal quotation marks omitted). *Viera* v. *Cohen*, 283 Conn. 412, 449–50, 927 A.2d 843 (2007). The assessment of damages was contested at trial, and the jury was called upon to set forth its findings as to the damages, if any, related to each pool. "Special interrogatories test the jury's general verdict against its conclusions as to the ultimate controlling facts. Special questions are propounded to a jury to bring out some or all of the determinative facts which should be considered in the formation of a jury's general verdict. Such questions . . . may show how closely, or otherwise, the jury has followed the trial court's instructions . . . ." (Footnotes omitted.) 75B Am. Jur. 2d 383 Trial § 1590 (2007). "A special verdict, finding or answer must be construed in the light of the surrounding circumstances. It is to be construed in the light of, and in connection with, the pleadings, the issue or question submitted, the instructions, jury interrogatories, and . . . the evidence." 89 C.J.S. Trials § 1177 (2012).

The record supports the plaintiff's observation that, given the size of the jury's award and the fact that it is a mere ten cents less than the gross amount of damages suggested by the plaintiff's attorney during closing argument, it appears that the jury awarded damages consistent with that gross damages figure and, as nearly as practicable, divided that figure by nineteen to arrive at its findings of damages for each pool. This is problematic for a number of reasons. First, such an approach to completing the interrogatories would have disregarded the court's instructions that the jury find damages separately for *each* pool and record its separate findings on the interrogatory forms. Second, our review of the evidence does not explain or support the jury's identical

findings of damages for all nineteen pools, particularly where the plaintiff had carefully detailed in the course of argument what it believed to be the full extent of its claimed and proven damages with regard to each pool. Third, the court instructed the jury that lost profits were not a proper component of damages in this case, yet the gross amount of damages explicitly suggested by the plaintiff's attorney included lost profits. Additionally, the gross damages figure suggested by the plaintiff's attorney included miscellaneous expenses for which the jury, in its responses to the interrogatories, made a finding of zero dollars.

Setting aside the impossibility of reconciling the amounts of damages awarded for the nineteen pools with the amounts sought by the plaintiff, the plaintiff suggests that the jury was not bound by the gross damages figure suggested by its attorney during argument, which, adjusted to exclude a claim for lost profits, was $2,365,562. In arguing that a higher gross damages award was not necessarily improper, the plaintiff relies on the principle, reflected in the court's instructions, that the arguments of counsel are not evidence and that the determination of damages is within the province of the jury. The fact remains, however, that with regard to six pools for which the plaintiff did not seek *any* future damages, the jury's award exceeded the maximum award made possible by the evidence of past damages. For four of these pools, the parties had reached settlements prior to trial and the plaintiff asked only for the cost of prior repairs that had been undertaken, which, in each case, was far less than the $145,274.10 awarded by the jury.[11] With regard to several other pools, the plaintiff sought future damages in the form of replacement costs, yet the amounts awarded exceeded the amounts sought by the plaintiff. At trial, the plaintiff presented evidence that the pools that needed to be replaced in the future could be replaced at the cost for which the plaintiff initially constructed the pools. Evidence of these costs was presented, yet our review of such evidence does not shed light on or explain the jury's uniform findings of damages. Further, as the defendant argues, this evidence appears to support an award of future damages that was *less*, not *more*, than that suggested by the plaintiff's counsel in argument. The plaintiff also presented evidence that it would cost an additional $25,000 to $35,000 to remove each of the damaged pools. Yet, the plaintiff suggests that the jury, having reviewed these materials in evidence, reasonably could have found that replacement costs actually exceeded these amounts. Insofar as the jury was bound to base its findings on the evidence, rather than speculation, such an argument is not persuasive.

Here, there is no rational view of the evidence that supports the identical finding of damages with regard to each of the nineteen pools at issue. These findings

reflect that the jury did not make an independent assessment of damages with regard to each pool. Furthermore, the jury made a total award of damages that nearly matched the gross damages figure suggested by the plaintiff's counsel before subtracting lost profits. For the reasons previously set forth, such an award is not supported by the evidence. The completed interrogatories, as well as the overall amount of the award, undermine confidence in the manner in which the jury assessed damages overall; they reflect that the jury either failed or declined to follow the court's instructions. For these reasons, we conclude that the court abused its discretion in failing to set aside the verdict solely as to the jury's assessment of damages. See *Schroeder* v. *Triangulum Associates*, 259 Conn. 325, 332, 789 A.2d 459 (2002).

## II

Next, we address the defendant's claim that the court improperly awarded the plaintiff punitive damages. The defendant argues that: (1) the act does not contemplate an award of punitive damages when a plaintiff's cause of action is based on property damages only; (2) the evidence did not permit such an award in the present case because there was no evidence that the defendant acted in reckless disregard for the safety of product users, consumers or others who were injured by the Shotcrete; and (3) the amount of punitive damages awarded exceeded the maximum possible award of punitive damages that was supported by the evidence. We will address each aspect of the claim, in turn.

## A

First, the defendant challenges the propriety of the award of punitive damages on the ground that the act does not contemplate an award of punitive damages when a plaintiff's cause of action is based on property damages only. Furthermore, the defendant argues that, even if punitive damages may be awarded when a plaintiff's cause of action is based on property damages only, such damages may be awarded only if there was a risk that consumers or others could sustain bodily injury by means of the defective product. The defendant's arguments are not persuasive.

General Statutes § 52-240b provides: "Punitive damages may be awarded if the claimant proves that the harm suffered was the result of the product seller's reckless disregard for the safety of product users, consumers or others who were injured by the product. If the trier of fact determines that punitive damages should be awarded, the court shall determine the amount of such damages not to exceed an amount equal to twice the damages awarded to the plaintiff." Several statutorily defined words applicable to the act are relevant. " 'Harm' includes damage to property, including the product itself, and personal injuries including wrongful

death. As between commercial parties, 'harm' does not include commercial loss." General Statutes § 52-572m (d).[12] A " '[p]roduct liability claim' includes all claims or actions brought for personal injury, death or property damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of any product. . . ." General Statutes § 52-572m (b).

There is no dispute that the plaintiff's cause of action is based on a claim of property damage. In rejecting the defendant's interpretation of the act in its thorough memorandum of decision concerning punitive damages, the court reasoned that the legislature intended to permit an award of punitive damages in connection with product liability claims involving only property damage. The court relied on its interpretation of the relevant statutory language previously set forth, as well as a Superior Court decision that reached the same legal conclusion, *American Airlines, Inc.* v. *National Automatic Products Co.*, 39 Conn. Supp. 269, 272, 477 A.2d 171 (1984).[13]

The issue presents a question of statutory interpretation that warrants our plenary review. See *Felician Sisters of St. Francis of Connecticut, Inc.* v. *Historic District Commission*, 284 Conn. 838, 847, 937 A.2d 39 (2008). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Citation omitted; internal quotation marks omitted.) *Cogan* v. *Chase Manhattan Auto Financial Corp.*, 276 Conn. 1, 7, 882 A.2d 597 (2005).

Like the trial court, we conclude that a fair reading of the governing statute, § 52-240b, in conjunction with the relevant definitional provisions expressly made applicable to that statute and previously set forth, yields a plain and unambiguous interpretation that the statute permits an award of punitive damages in connection

with a product liability claim involving damage to property only. The defendant goes on to argue that even if § 52-240b permits an award of punitive damages in the context of a claim based on property damage only, the text of the statute reflects that such damages must arise in a case in which there was, in fact, a risk that product users, consumers, or others could sustain *bodily injury* by means of the defective product. The defendant argues that, here, "the plaintiff . . . presented no evidence that the safety of consumers was ever at risk or that injury to consumers was even a possibility."

The defendant's argument is based on the language of § 52-240b, which provides: "Punitive damages may be awarded if the claimant proves that the harm suffered was the result of the product seller's reckless disregard for the *safety* of product users, consumers or others who were *injured* by the product. . . ." (Emphasis added.) The defendant suggests that the use of the words "safety" and "injured" in the statute reflect that, at the very least, the legislature intended to permit an award of damages in cases in which bodily injury was at risk. The defendant argues that, although there was evidence of property damage, there was no evidence of a risk of bodily injury in the present case.

Under the circumstances of the present case, we need not determine whether the defendant's suggested interpretation of § 52-240b, requiring a risk of bodily injury, is correct. To demonstrate reversible error, it is not enough for the defendant to demonstrate as a matter of law that punitive damages may be awarded only if there was a risk that product users, consumers, or others could sustain bodily injury by means of the defective product. The defendant bears the burden of demonstrating that any claimed error in the court's interpretation and application of the law affected the verdict returned in the present case. "Whether an error is harmful or harmless depends upon whether it affected the verdict." *Beinhorn* v. *Saraceno*, 23 Conn. App. 487, 494 n.3, 582 A.2d 208 (1990), cert. denied, 217 Conn. 809, 585 A.2d 1233 (1991).

Thus, to demonstrate reversible error, the defendant must demonstrate that the jury did not base or was precluded from basing its award on a finding that bodily injury was at risk, but the record does not support such an interpretation of the jury's findings. When the court instructed the jury concerning punitive damages under the act, it cannot be said to have limited the jury to consider *either* property damage *or* bodily injury. Instead, the court instructed the jury by referring to the statutory language of § 52-240b that, as previously discussed, refers to "the product seller's reckless disregard for the safety of product users, consumers or others who are injured by the product."[14] The defendant did not file a request to charge related to the issue of punitive damages, did not take any exceptions to the

court's charge, and, on appeal, does not attempt to challenge the propriety of the court's charge. Moreover, the interrogatories presented to the jury did not require it to provide findings in this specific regard concerning the facts on which it based its punitive damage award.[15] Thus, with regard to this discrete issue concerning the nature of the risk posed by the defendant's product, the jury returned what may be deemed a general verdict. Consequently, the record does not provide a basis on which to determine whether or not the jury based its punitive damage award on a finding that bodily injury was at risk. Because the record does not demonstrate that the verdict resulted from the issue that the defendant seeks to adjudicate on appeal, we need not resolve that issue.[16]

Additionally, contrary to the stated premise of the defendant's argument, the evidence readily supported a finding that its defective product risked causing bodily injury to product users. There was ample evidence of substantial cracking in various surface areas of pools that were constructed with Shotcrete manufactured by the defendant, such as stairs, benches, swim outs, walls, and floors. The undisputed evidence reflects that the Shotcrete at issue was intended to be used in such recreational swimming pools, which made it reasonable to infer that persons were likely to come in contact with the various surface areas of the pools. The Shotcrete was delivered to the pool sites by the defendant. On the basis of this evidence, we readily conclude that the evidence reasonably supported a finding by the jury that the defendant had acted in reckless disregard of a foreseeable risk that others could sustain bodily injury by means of the defective Shotcrete. For the foregoing reasons, we conclude that this aspect of the defendant's claim is unavailing.

### B

Next, the defendant argues that the evidence did not permit an award of punitive damages in the present case because there was no evidence that the defendant acted in reckless disregard for the safety of product users, consumers or others who were injured by the Shotcrete. We disagree.

As previously stated in this opinion, the jury in completing its interrogatories made a finding that the plaintiff had proven by a preponderance of the evidence that the defendant acted with a reckless disregard for the safety of product users, consumers or others who were injured by the product. In its memorandum of decision concerning punitive damages, the court observed that its role with regard to punitive damages was limited to determining the amount of the punitive damages award. The court stated: "While the jury found that the plaintiff . . . had proven its entitlement to punitive damages, the amount itself is a responsibility and a duty reserved to the court." Nonetheless, in its lengthy memorandum

of decision concerning punitive damages, the court did not merely address the defendant's contention, discussed in part II A of this opinion, that punitive damages were not permitted as a matter of law and determine the amount of its damage award, but it purported to make findings concerning the conduct of the defendant on the basis of the evidence presented at trial. Also, it did so after it had summarily denied the defendant's motion to set aside the verdict. Ultimately, the court concluded that "a reasonable person could readily arrive at the same conclusion [with respect to the issue of punitive damages as that] agreed upon by this jury."

In this portion of its appeal, the defendant appears to focus on these findings made by the court, but also argues generally that the evidence, "at best demonstrates that the owners of [the defendant] may have been less involved in the day-to-day operations of [the defendant's Shotcrete] facility than they might have been." The defendant asserts that the plaintiff did not present evidence that it acted "more than negligently with respect to the operation of the plant and the delivery of the Shotcrete to the plaintiffs. As a result, the award of punitive damages should be set aside."

Insofar as this aspect of the defendant's appeal challenges the propriety of the finding that it acted with a reckless disregard for the safety of product users, consumers or others who were injured by the defendant's product, it essentially challenges the court's denial of its motion to set aside the finding of the jury. The record of the trial proceedings reflects that the defendant raised the evidentiary claim herein in connection with that motion. Although the court, in the context of its memorandum of decision awarding punitive damages, referred to the propriety of that finding and the evidence that supported it, we will regard the claim as challenging the court's summary denial of the motion to set aside the verdict. The applicable standard of review is set forth in part I of this opinion.

We conclude that the evidence supported the jury's finding of fact. The statute expressly provides that punitive damages may be awarded "if the claimant proves that the harm suffered was the result of the product seller's reckless disregard for the safety of product users, consumers or others who were injured by the product. . . ." General Statutes § 52-240b. With regard to the reckless disregard requirement, this court has stated: "As a general matter, [p]unitive damages . . . are awarded when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence. . . . In a products liability action, [p]unitive damages may be awarded if the claimant proves that the harm suffered was the result

of the product seller's reckless disregard for the safety of product users, consumers or others who were injured by the product. . . . As a general rule, punitive damages may be awarded only for outrageous conduct. . . . The conduct must be outrageous, either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the interests of others." (Citations omitted; internal quotation marks omitted.) *Ames* v. *Sears, Roebuck & Co.*, 8 Conn. App. 642, 655, 514 A.2d 352, cert. denied, 201 Conn. 809, 515 A.2d 378 (1986).

"The occasion for awarding punitive damages is quite different from that of awarding compensatory damages under our long-standing rules governing the award of punitive damages. . . . Punitive damages are awarded when the evidence shows a reckless indifference to the rights of others or an intentional or wanton violation of those rights. . . . If awarded, they are restricted to cost of litigation less taxable costs of the action. . . . Moreover, punitive damages generally have the flavor of punishment against a defendant for the quality of his conduct and of deterrence to a defendant or others against such conduct in the future. . . . Such damages are, therefore, not doctrinally duplicative of compensatory damages, but rather serve special, limited purposes other than compensation." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Champagne* v. *Raybestos-Manhattan, Inc.*, 212 Conn. 509, 532–33, 562 A.2d 1100 (1989).

The defendant suggests in argument that the jury's finding is unsupportable because there was no evidence that it intentionally violated the plaintiff's rights. Yet, as previously stated, reckless disregard may be proven by evidence of conduct by a defendant that is outrageous because it was done with reckless indifference to the interests of others. There was ample evidence concerning the defendant's principals, employees, plant operations, procedures, equipment and methods of delivery. On the basis of the evidence presented at trial, the jury reasonably could have found that the defendant lacked trained employees and quality control procedures to produce and deliver quality Shotcrete consistently. The evidence supported a finding that persons in positions of control for the defendant even lacked a basic understanding of how Shotcrete was manufactured and were seemingly *unconcerned* either with producing a product that was manufactured and delivered according to industry standards or with how their pattern of conduct would negatively affect the interests of the consumers who purchased this critical building material from their company.

In its decision concerning punitive damages, the court aptly discussed evidence that is relevant to our analysis. The court stated in relevant part: "Given [the] essential function for concrete in its several manifesta-

tions, and the readily foreseeable damages wrought by defectively formulated and/or manufactured concrete, the court was surprised to learn during the course of the trial that some principals of the defendant . . . demonstrated a cavalier or indifferent attitude toward their company's product offered for sale. This attitude was exemplified and borne out by the sworn testimony of some of the officers of [the defendant], Richard and Grace Vona, as well as Carlo Vona, each of whom professed ignorance in the key areas like the specifics of the concrete manufacturing process itself."

The court went on to observe: "John Kavanaugh was formerly employed as a concrete batch mixer and delivery driver for [the defendant] after a short earlier stint working at Paramount Stone. He worked for the Vonas [at the defendant] for approximately two and one-half years. During that time, although not required by law, the defendant concrete plant never met the specifications for industry certification by the American Concrete Institute. Despite a trip to a Las Vegas concrete convention with Richard Vona, [a vice president of the defendant], and his attendance at two other classes, Kavanaugh did not consider himself properly trained as a batch mixer by [the defendant]. Nonetheless, it became his job to ensure that the raw materials used in making Shotcrete were properly mixed in the defendant's trucks. Kavanaugh testified to problems and shortcomings with the defendant's equipment. These included the lack of a 'moisture meter,' which could accurately measure water content in the sand the company stored outdoors, and the lack of any drum counters, which measure the number of revolutions made by the rotating concrete drums of the defendant's mixing trucks.[17] Certain maintenance issues at the plant and with the concrete trucks also adversely affected the finished product sold by the defendant to the plaintiff. The jury also heard deposition testimony of Steve Riviere, the former president of [the defendant], who left his job at the enterprise abruptly. It reinforced the picture painted by both Kavanaugh and the circumstantial evidence of a small, poorly run and poorly equipped company lacking quality control, adequate staff and training and equipment maintenance, leading to the delivery of an inconsistent concrete product, all to the plaintiff's detriment. . . .

"[The evidence demonstrated that] [c]oncrete is properly made with concrete sand, which is a sand formulated for concrete and containing three-eighths inch stone. However, Kavanaugh . . . testified that [the defendant] also used masonry sand in its concrete mixes on a random basis, a sand which has a different granularity and consistency. Without other adjustments to the mix, masonry sand and concrete sand therefore are not interchangeable in Shotcrete, and Kavanaugh's testimony was supported by the evidence, not only in the faults in the cracked Shotcrete, but by the defendant

company's own internal documentation obtained by the plaintiff during discovery. A delivery ticket showed masonry sand delivered to [the defendant] on more than one occasion. In light of all the other evidence of defective Shotcrete, the jury obviously chose not to credit the defense explanation that this masonry sand was actually delivered to Paramount Stone [which was located] across the street [from the defendant's plant]."

The court went on to observe, accurately, that the trial testimony of Richard Vona, the defendant's vice president; Grace Vona, the defendant's owner; and Carlo Vona, a longtime mason who had some involvement in the defendant and is married to Grace Vona, was damaging to the defendant's case. Richard Vona testified, in part, that after coming up with the idea to create the defendant company in 2003, he only visited the defendant's plant on a couple of occasions and did not even discuss the operations of the company with others. He testified that he lacked a basic understanding of how Shotcrete was made. Despite evidence that she was involved intimately in the defendant's finances, the defendant's owner, Grace Vona, testified that she had never visited the defendant's plant and was unaware if the defendant ever was profitable. "The court is convinced, and the jury likely believed, that once the cracks in all the pools came to light, the Vonas were . . . eager to distance themselves from their own concrete company and what went on there as a way of distancing themselves from any liability for the defendant's defective Shotcrete, the Shotcrete that went into the nineteen cracked pools built by the plaintiff.

"The jury also heard testimony from Mel Thorne, who has served as the chief operating officer of [the defendant] since the 2009 departure of Steve Riviere. While not employed by the defendant at the time of the manufacture and sale of the defective Shotcrete used by the plaintiff in nineteen of its pools, Thorne testified that he has been unable to verify the existence of any formal quality control process used by the defendant company during that time frame."

On the basis of the foregoing evidence, accurately set forth by the trial court, we readily conclude that the evidence reasonably permitted a finding that the defendant, through its officers and employees, acted in an outrageous manner. The evidence showed that the defendant was not merely negligent or inadvertent in its manufacturing process, but that its business operations reflected a wholesale lack of concern for the interests of the purchasers of its product, which was a critical building material in pools. Accordingly, we reject the defendant's claim that the evidence did not permit a finding of reckless disregard on its part.

C

Last, as it did before the trial court, the defendant

argues that the court's punitive damage award was improper because it exceeded the amount of punitive damages that was supported by the evidence. We agree with the defendant that the court improperly calculated punitive damages.

The court held a hearing on the matter of its award of punitive damages. At that hearing, the attorneys representing the plaintiff, Thomas P. O'Dea, Jr., and Raymond J. Plouffe, argued in support of an award of punitive damages in this case. Plouffe and O'Dea presented the court with affidavits concerning their attorney's fees as well as redacted bills concerning legal services rendered in the course of their representation of the plaintiff in this matter. By way of a supplemental affidavit concerning attorney's fees dated April 15, 2011, O'Dea averred that he had expended 1360 hours on the present case. He stated: "My customary hourly rate for services rendered is $325.00. In this matter we agreed to a discounted rate of $150 per hour for my rate." Additionally, he averred, in relevant part, that these figures did not include time expended after March 1, 2011, which was estimated to be twenty hours. There was no objection to this submission, and the defendant did not dispute the accuracy of the representations therein.

In its memorandum of decision, the court found that attorney's fees attributable to Plouffe and another attorney associated with his law firm were $252,392.50. On appeal, the defendant does not challenge this finding. With respect to O'Dea, the court stated: "Attorney O'Dea stated in his affidavit that his customary hourly rate for legal services is $325, and that in this matter he agreed with the plaintiff to a discounted rate of $150 per hour. However, this was a discount intended to inure to the benefit of the plaintiff, not the defendant. For purposes of this order, the court finds that counsel worked a minimum of 1360 hours on these cases, and the court also finds that the regular hourly rate of $325 for Attorney O'Dea's services is both reasonable and appropriate. The attorney's fees for Attorney O'Dea are therefore found to be $442,000."

The defendant asserts that the award of $442,000 cannot stand because there was no evidence that O'Dea ever charged the plaintiff this amount for attorney's fees. Instead, the defendant argues, the evidence "supports at most an award of $204,000," representing 1360 hours billed at the hourly rate that O'Dea represented he had billed the plaintiff, $150 per hour. The defendant argues that the court's award of more than the plaintiff's actual litigation expenses exceeded a proper measure of punitive damages applicable in a case such as the present case and amounted to an arbitrary deprivation of its property in violation of the due process clause of the federal constitution.

In determining the proper method by which to calcu-

late damages in the present case, the court observed that, beyond stating in § 52-240b that punitive damages "[shall] not . . . exceed an amount equal to twice the damages awarded to the plaintiff," the legislature did not provide a method by which to calculate such damages under the act. The court, relying on precedent including *Lynn* v. *Haybuster Mfg.*, *Inc.*, 226 Conn. 282, 289–90, 627 A.2d 1288 (1993), *Berry* v. *Loiseau*, 223 Conn. 786, 825–27, 614 A.2d 414 (1992), and *Arnone* v. *Enfield*, 79 Conn. App. 501, 521, 831 A.2d 260, cert. denied, 266 Conn. 932, 837 A.2d 804 (2003), reasoned that it was proper to follow the common-law rule limiting punitive damages to the plaintiff's litigation expenses minus taxable costs.

On appeal, neither party takes issue with the court's legal determination that, faced with legislative silence as to the proper method of calculating punitive damages under the act, it is appropriate to follow the common-law rule and award the plaintiff its litigation expenses, less taxable costs. For this reason, we do not adjudicate the issue.[18] The issue, as framed by the defendant, is whether the court properly assessed the plaintiff's litigation expenses in accordance with the evidence.

In determining whether the court properly calculated damages under the common-law rule, we begin by observing that in *Berry* v. *Loiseau*, supra, 223 Conn. 827, our Supreme Court, in upholding the viability of the common-law rule, stated: "In *Waterbury Petroleum Products*, *Inc.* v. *Canaan Oil & Fuel Co.*, [193 Conn. 208, 236, 477 A.2d 988 (1984)], we declined [an] invitation to stray from our well settled rule regarding the measurement of punitive damages. We affirmed the continuing viability of a long line of cases holding that common law punitive damages serve primarily to compensate the plaintiff for his injuries and, thus, are properly limited to *the plaintiff's litigation expenses less taxable costs.* . . . We recognized, moreover, that our rule, when viewed in the light of the increasing costs of litigation, also serves to punish and deter wrongful conduct. . . . In recent years, we have continued to adhere to the view that our traditional rule remains viable. . . . We remain convinced that a rule limiting punitive damages awards to the expenses of litigation less taxable costs fulfills the salutary purpose of fully compensating a victim for the harm inflicted on him while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury." (Citations omitted; emphasis added; internal quotation marks omitted.); see also *Anastasia* v. *General Casualty Co. of Wisconsin*, 307 Conn. 706, 709 n.2, 59 A.3d 207 (2013); *Harty* v. *Cantor Fitzgerald & Co.*, 275 Conn. 72, 96–97, 881 A.2d 139 (2005); *Matthiessen* v. *Vanech*, 266 Conn. 822, 826 n.5, 836 A.2d 394 (2003). It is clear in our law that an award of punitive damages "cannot exceed the amount of the plaintiff's expenses of litigation in the suit, less his taxable costs." *Hanna* v. *Sweeney*, 78 Conn.

492, 494, 62 A. 785 (1906); see also *Maisenbacker* v. *Society Concordia*, 71 Conn. 369, 378, 42 A. 67 (1899) (plaintiff's expenses limit amount of punitive damages which can be awarded).

In the present case, the court was presented with evidence of the plaintiff's litigation expenses. With regard to the expenses related to O'Dea, which are the subject of this claim, O'Dea made averments concerning the number of hours that he had worked on the present case (1360 hours) as well as the hourly rate at which he had agreed to perform legal services for the plaintiff ($150 per hour). O'Dea submitted redacted bills related to the 1360 hours in legal services rendered by him. He averred that, with regard to these bills, the Scottsdale Insurance Company had paid $130,727.99 in fees and his firm was owed $48,337.91 in fees from either the Scottsdale Insurance Company or the plaintiff.

The court properly stated that it was permitted to award punitive damages limited to the plaintiff's litigation expenses, less costs. Yet, the court went on to undertake an independent assessment of the value of O'Dea's fees, a type of inquiry that is appropriate when a court is authorized to award statutory attorney's fees.[19] Thus, it based its award on a lodestar calculation and considerations related thereto. See *Ernst* v. *Deere & Co.*, 92 Conn. App. 572, 576, 886 A.2d 845 (2005).[20]

The court's award, therefore, cannot be upheld as being limited to the plaintiff's litigation expenses. It is clear from the evidence presented to the court that the plaintiff's expenses were limited to the fees it incurred pursuant to its agreement with O'Dea, namely, fees billed at an hourly rate of $150. It was contrary to the evidence for the court to award the plaintiff litigation expenses billed at $325 an hour. Accordingly, we reverse the award of punitive damages and, as part of the proceedings on remand, order the court to consider the plaintiff's litigation expenses in accordance with the foregoing analysis.[21]

Additionally, we note that of the 1360 hours of legal services rendered by O'Dea in the present case as of the time of the punitive damages hearing, O'Dea averred that the Scottsdale Insurance Company (Scottsdale) had paid some of the fees and that the company possibly owed him more fees. In its memorandum of decision, the court referred to the legal fees incurred by the plaintiff in defending "four other civil suits brought against it by its customers," and determined that such fees had been proximately caused by the defendant and should be borne by the defendant as punitive damages in this case. Yet, the court neither referred specifically to Scottsdale nor set forth clear findings concerning how the services rendered by O'Dea for which he was paid or expected to be paid by Scottsdale were incurred in connection with the prosecution of the present case. Because we remand the case for a new hearing before

the court to reassess the amount of the plaintiff's punitive damages, the court, on remand, must revisit the issue and make appropriate findings concerning the legal services for which fees were incurred by Scottsdale and determine whether the fees associated with such services properly may be included in the plaintiff's litigation expenses in the present case.

The judgment is affirmed with respect to the jury's findings that the defendant is liable for violating the act and that the plaintiff is entitled to punitive damages under the act. The judgment is reversed with respect to the jury's award of compensatory damages and the trial court's award of punitive damages. The case is remanded for a hearing in damages before a jury—or before the court, if the parties agree to waive a hearing before a jury—on the plaintiff's claim for compensatory damages, and for a separate hearing, to be held before the trial court, to determine, in accordance with this opinion, the award of punitive damages to which the plaintiff is entitled under the act.

In this opinion the other judges concurred.

[1] The plaintiff's original complaint, dated May 21, 2009, and its amended complaint, dated February 14, 2011, were brought solely against Paramount Concrete, Inc. The judgment from which Paramount Concrete, Inc., appeals was rendered solely against Paramount Concrete, Inc. During the course of the litigation, the trial court consolidated this action with other actions that were brought against the plaintiff by other parties, namely, homeowners seeking damages arising from defective swimming pools. The record reflects that settlements were reached in those other actions prior to the commencement of the trial. Because Paramount Concrete, Inc., is the only defendant in this appeal, we refer to that party as the defendant throughout this opinion.

[2] We conclude in part I B of this opinion that the jury's award of compensatory damages must be set aside. We are not persuaded, however, that the jury's error in awarding damages affects or calls into doubt the propriety of its findings concerning liability or punitive damages. Accordingly, in parts I A and II B of this opinion, we consider and reject the defendant's claims concerning those findings made by the jury. Aside from the issue of damages, our remand order does not implicate those findings made by the jury.

The jury's error in awarding compensatory damages does not require us to set aside the court's determination that punitive damages were appropriate in the present case. In part II A of this opinion, we uphold that aspect of the trial court's judgment. In part II C of this opinion, however, we agree with the defendant that the court improperly *calculated* the punitive damage award. Accordingly, we will remand the case to the trial court with direction that it reassess the amount of punitive damages consistent with this opinion and General Statutes § 52-240b following the hearing in damages.

[3] Consistent with its special defenses, the defendant attempted to prove, among other things, that the plaintiff arranged for delivery of the Shotcrete under conditions that reduced its strength and usefulness; added water to the Shotcrete after it was delivered, such that it could not function properly; utilized persons who did not apply the Shotcrete appropriately; and failed to utilize a sufficient quantity of steel in the construction of the pools at issue, such that the Shotcrete did not function in the manner for which it was intended.

[4] Although the plaintiff, in its complaint, alleged damages with regard to seventeen pools, at trial, the plaintiff presented evidence and sought damages with regard to nineteen pools. The disparity is not an issue in this appeal.

[5] With regard to the nineteen pools at issue, the dollar amounts of damages sought by the plaintiff varied significantly. The amounts of *past* damages ranged from zero dollars to $138,763.89. The amounts of *future* damages ranged from zero dollars to $293,660. The *total* damages amounts ranged from $17,297.19 to $306,563.81

[6] The court found that the plaintiff incurred attorney's fees totaling $694,392.50.

[7] At trial, the pools at issue were identified as being located at 19 Deerwood Lane, Westport; 917 Merwins Lane, Fairfield; 220 Greenfield Hill Road, Fairfield; and 62 Weston Road, Westport.

[8] At trial, the pools at issue were identified as being located at 220 Greenfield Road, Fairfield; 17 Apple Tree Lane, Darien; 19 Deerwood Lane, Westport; and 917 Merwins Lane, Fairfield.

[9] At trial, the pools at issue were identified as being located at 17 Joanne Lane, Weston; 17 Twelve O'Clock Road, Weston; 47 Appletree Lane, New Canaan; and 9 Marc Lane, Westport.

[10] "Subject to the provisions of Section 16-17, the judicial authority shall, if the verdict is in order and is technically correct, accept it without comment." Practice Book § 16-31.

[11] As supported by the evidence, the plaintiff argued for an award of $40,765.08 for 17 Joanne Lane, Weston; $34,596.08 for 17 Twelve O'Clock Road, Weston; $49,622.43 for 47 Appletree Lane, New Canaan; and $67,938.14 for 9 Marc Lane, Westport.

[12] "Commercial loss" does not include costs incurred by a commercial party in repairing damage to property caused by a defective product, nor is it limited to property owned by the party seeking to recover under the act. See *Sylvan R. Shemitz Designs, Inc.* v. *Newark Corp.*, 291 Conn. 224, 240–41, 967 A.2d 1188 (2009).

[13] *American Airlines, Inc.*, was cited approvingly in *Ames* v. *Sears, Roebuck & Co.*, 8 Conn. App. 642, 655, 514 A.2d 352, cert. denied, 201 Conn. 809, 515 A.2d 378 (1986).

[14] The court stated in relevant part: "Now, in addition to seeking compensatory damages, the plaintiff seeks an award of punitive damages. Punitive damages are damages awarded not to compensate the plaintiff for any injury or losses, but to punish the defendant for outrageous conduct and to deter it and others like it from similar conduct in the future.

"Punitive damages may be awarded for conduct that is outrageous because of the defendant's reckless indifference to the rights of others or an intentional and wanton violation of those rights.

"You may award punitive damages only if you unanimously find from facts established by a preponderance of the evidence that the conduct of the defendant was, in fact, outrageous.

"The law does not require you to award punitive damages. It is instead a matter for your sound discretion. An award of punitive damages or any award of damages, for that matter, must not reflect bias, prejudice or sympathy with respect to any party. It must instead be fairly based on the evidence in this case.

"Pursuant to statute, punitive damages may be awarded in a Product Liability Act case if the plaintiff proved by a preponderance of the evidence that the harm suffered was the result of the product seller's reckless disregard for the safety of product users, consumers or others who are injured by the product.

"If the jury determines that punitive damages should be awarded, the court in its discretion shall determine the actual amount of such damages in an amount not to exceed twice the damages awarded to the plaintiff.

"You should consider the reprehensibility of the defendant's conduct and the actual harm suffered by the plaintiff, and you must unanimously find it necessary for achieving the objectives of punitive damages that I have described."

[15] The interrogatory states: "Has the plaintiff R.I. Pools, Inc., proven by a preponderance of the evidence its entitlement to punitive damages in that you find that the defendant Paramount Concrete, Inc., acted with a reckless disregard for the safety of product users, consumers or others who were injured by the product? (If you find for the plaintiff as to punitive damages, the court will determine the amount of any award)." The jury responded to this interrogatory by inscribing a check mark on the line marked "Yes."

[16] "In a typical general verdict rule case, the record is silent regarding whether the jury verdict resulted from the issue that the appellant seeks to have adjudicated. . . . Under the general verdict rule, if a jury renders a general verdict for one party, and [the party raising a claim of error on appeal did not request] interrogatories, an appellate court will presume that the jury found every issue in favor of the prevailing party. . . . Thus, in a case in which the general verdict rule operates, if any ground for the verdict is proper, the verdict must stand; only if every ground is improper does the verdict fall. . . . Even in a case with a single count complaint, the general verdict rule applies when reliance is placed upon grounds of action . . . which are distinct, not because they involve specific sets of facts forming

a part of the transaction but in the essential basis of the right replied upon . . . . [T]he general verdict rule would apply in a case in which a single count of a complaint alleged both wanton misconduct and negligence. . . . The applicability of the general verdict rule does not depend on the niceties of pleading but on the distinctness and severability of the claims and defenses raised at trial." (Citations omitted; internal quotation marks omitted.) *Konesky* v. *Post Road Entertainment*, 144 Conn. App. 128, 132–33, 72 A.3d 1152, cert. denied, 310 Conn. 915, 76 A.3d 630 (2013).

[17] There was evidence presented at trial that such quality control measures were integral to the proper manufacture and delivery of Shotcrete.

[18] We observe, however, that there is no binding precedent on the issue of whether the common-law punitive damages rule applies to an award of statutory punitive damages under § 52-240b. See *Bifolck* v. *Philip Morris, Inc.*, United States District Court, Docket No. 3:06cv1768 (SRU) (D. Conn. February 14, 2014) (order certifying question to Connecticut Supreme Court).

[19] See, e.g., General Statutes § 52-240a, which permits an award of attorney's fees to the prevailing party in a product liability action upon a finding by the court that a claim or defense made in connection with such action is frivolous. The court was not asked to award such fees in the present case, and it did not rely on § 52-240a in its award of damages.

[20] "[T]he initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate. . . . The courts may then adjust this lodestar calculation by other factors. . . . For guidance in adjusting attorney's fees, Connecticut courts have adopted the twelve factors set forth in *Johnson* v. *Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). The *Johnson* factors are (1) the time and labor required, (2) the novelty and difficulty of the questions, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee for similar work in the community, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation and ability of the attorneys, (10) the undesirability of the case, (11) the nature and length of the professional relationship with the client and (12) awards in similar cases." (Citation omitted; internal quotation marks omitted.) *Ernst* v. *Deere & Co.*, supra, 92 Conn. App. 576; see also *Laudano* v. *New Haven*, 58 Conn. App. 819, 822–23, 755 A.2d 907 (2000).

[21] In light of the foregoing, we agree with the defendant that the court violated notions of basic due process by awarding punitive damages far in excess of the attorney's fees incurred by the plaintiff. It appears from the record that the defendant lacked fair notice that the court could impose an award that exceeded that permitted under the common law.